## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHANIKA LEWIS,

     *Plaintiff*,

*v.*                        CASE NO. 2:13-CV-14240

CAROLYN W. COLVIN         DISTRICT JUDGE ROBERT H. CLELAND
Commissioner of Social Security,   MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI of the Social Security Act 42 U.S.C. §§ 1381-1383f. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 20.)

Plaintiff Shanika Lewis was eighteen years old on the date she alleges her disability began, January 1, 1996. (Transcript, Doc. 14 at 235.) She has no relevant past work experience. (Tr. at 30, 315, 242.) On March 25, 2009, Plaintiff filed the present claim for DIB,[2] claiming she became disabled on January 1, 1996. (Tr. at 235.)

The claim was denied at the initial administrative stage. (Tr. at 141.) In denying the claim, the Commissioner considered affective disorders, "[m]uscle/[l]ligament" disorder, and fascia. (*Id.*) On September 17, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") William Callahan, who considered the application for benefits de novo. (Tr. at 104-39.) In his decision issued on February 17, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 145, 154.) Plaintiff requested a review of this decision on March 30, 2011. (Tr. at 191.) The Appeals Council granted her review request and remanded the case to an ALJ. (Tr. at 159-60.) The Council found that parts of the ALJ decision were vague and incomplete, and instructed the ALJ on remand to further consider her residual functional capacity ("RFC") and obtain additional evidence from a vocational expert ("VE"). (*Id.*)

A second hearing was held, on April 24, 2012 in front of ALJ Jeanne VanderHeide. (Tr. at 65-102.) After reconsidering the RFC and supplementing the prior VE testimony, ALJ VanderHeide decided on June 22, 2012 that Plaintiff was not disabled. (Tr. at 48, 60.) Plaintiff requested review of the decision on August 1, 2012. (Tr. at 22.)

---

[2] The administrative law judge's ("ALJ") decision states that Plaintiff filed a duplicate claim on July 21, 2011, (Tr. at 48), but no such files are in the record.

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 6, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 2-4.) On October 4, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

**B.      Standard of Review**

The Social Security system contains a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for

substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*,

279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

C.     **Governing Law**

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date, March 25, 2009. (Tr. at 51.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "post gunshot wound to the stomach with residual left[-]sided issues, depression with psychotic features, substance abuse, degenerative joint disease of the

lumbar spine, and polycystic ovaries." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 51-53.) Step four of the analysis was unnecessary, as Plaintiff lacked past relevant work. (Tr. at 58.) The ALJ also found that Plaintiff was thirty years old on the application date, putting her in the "younger individual age" category. (Tr. at 59.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary jobs existing in significant numbers in the regional economy. (Tr. 53-59.)

### E.   Administrative Record

### 1.   Medical Records

Plaintiff was at a party in May 1995 when gunfire ripped into the crowd, hitting her in the left chest and hand. (Tr. 384, 468.) At the emergency room, her breath was clear and she had no "respiratory distress . . . ." (Tr. at 384-85.) The chest wound "was superficial down to the muscle"; pain limited her motion, but "there was no other focal, neurological[,] or vascular deficit." (Tr. at 388.) In addition to the gunshot injury, the emergency room notes mention a prior "vaginal laceration." (Tr. at 384, 388.) She was discharged the next day, (Tr. at 388), and later reports show the wounds healed "well." (Tr. at 383, 386-87.) By July, however, the pain had increased and she returned to the emergency room for treatment. (Tr. at 381.) Her pain was mild "on full range of motion," the notes state, and both her hand and chest appeared normal. (*Id.*) The examiner gave her Motrin and sent her home. (Tr. at 382.)

She saw Dr. James W. Agner the next month, the pain continuing in her left arm, particularly when moving or touching it. (Tr. at 380.) Her motor function was "good," and her sensation remained, though she noticed a slight decrease in her forearm. (*Id.*) The pain, and not any

other issue, limited her range of motion. (*Id.*) The examiner encouraged her to begin moving her arm and arranged for occupational therapy. (*Id.*) She would not need to return, he thought, (*Id.*), but the next week she arrived with chest pain. (Tr. at 379.) He attributed it to pleurisy and provided Orudis tablets. (*Id.*)

On August 23, the day after her last visit with Dr. Agner, she went to the emergency room with a two-day headache that she rated at five-out-of-ten on a visual analog ("VA") scale. (Tr. at 377.) The notes indicate a history of psychiatric disorders over the previous three years, including two hospitalizations for probable depression, the most recent occurring the prior week. (*Id.*) Her neck hurt, she reported a fever, and she had nausea. (*Id.*)

In October 1997, Plaintiff gave birth and, one month later, she entered the emergency room with vaginal pain. (Tr. at 375.) She told the examiner she smoked and occasionally used marijuana. (*Id.*) The doctor diagnosed cervicitis, gave her a "one time dose of ceftriaxone," and instructed her to see her gynecologist. (Tr. at 376.)

The next reported visit to the emergency room occurred on March 24, 1998, after "a low speed motor vehicle accident" that left Plaintiff with a bleeding tongue but no chest pain, nausea, or blackouts. (Tr. at 372.) The examiner found the cuts in her mouth and confirmed on examination that she was otherwise fine. (*Id.*) The bleeding stopped and she was discharged home. (Tr. at 373.)

On June 26, 1998, she returned to the emergency room with vaginal pain. (Tr. at 369-70.) The doctor could not find a cause and suggested she visit her gynecologist. (Tr. at 370.) An ultrasound of her pelvis, conducted on January 6, 1999, revealed a potential source of continuing vaginal pain: "[p]robable complicated cyst in the right ovary." (Tr. at 368.) A left chest x-ray, taken the same day to investigate Plaintiff's complaints of chest pain, was unremarkable. (Tr. at

9

367.) The physician diagnosed pelvic inflammatory disease and upper respiratory infection. (Tr. at 366.)

Plaintiff developed a fever on February 7, 2002, accompanied by chest pain. (Tr. at 362.) At the emergency room she also complained of nausea, vomiting, and headaches. (*Id.*) The psychiatric portion of the intake states, "Negative." (*Id.*) She had full range of motion, despite claiming neck stiffness, and walked without difficulty. (Tr. at 363.) Tylenol and intravenous fluid cleared her headache. (*Id.*) The examiner guessed that she had bacterial gastroenteritis, encouraged her to drink fluids, and gave her potassium and medication. (Tr. at 357, 360, 364.) The final diagnosis was "likely infectious diarrhea." (Tr. at 357.)

Plaintiff found herself in another car accident on July 30, 2002. (Tr. at 351.) She complained of pelvic and back pain, and told the examiner she had ovarian cysts in the past. (*Id.*) An ultrasound identified multiple follicles on the ovaries, but no cysts. (Tr. at 351, 353.)

Plaintiff saw Dr. Swarn Mahajan at New Center Community Mental Health Services on September 29, 2006. (Tr. at 406.) She reported that she was raped at thirteen and hospitalized for depression at fourteen. (*Id.*) Her current depression came on after her fiancé died in a car accident. (*Id.*) Her nights were restless, filled with nightmares of being shot again, and she struggled to concentrate during the day, sometimes hearing noises that Dr. Mahajan characterized as "auditory hallucinations." (*Id.*) She drank alcohol, smoked marijuana, and used cocaine, though she started drug rehabilitation the previous month. (*Id.*) She had been imprisoned three times for drug possession and assault. (Tr. at 399, 406.)

Dr. Mahajan thought her affect was restricted; her intelligence, average; her memory, intact; and her orientation, alert. (Tr. at 407.) He diagnosed major depressive disorder with psychotic

features, post traumatic stress disorder, and polysubstance dependence. (*Id.*) Her Global Assessment of Functioning ("GAF") was fifty-five, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000). He started her on medication and recommended outpatient psychotherapy. (*Id.*)

Plaintiff "did not keep the [following] app[ointment]" on October 16, 2006. (Tr. at 404.) She did not show for the next two meetings either. (*Id.*) When she missed for the third time, a staff member called and inquired the reason; she forgot, Plaintiff stated, and rescheduled. (Tr. at 402.) She forgot the rescheduled appointment as well, and in May 2007 New Center sent a notice, which prompted rescheduling another appointment that Plaintiff would miss. (*Id.*) Nor did she come for the following session in December 2007. (*Id.*) By January 2008, Plaintiff had not been to New Center in over one year, and her case was terminated. (Tr. at 401.)

Plaintiff was incarcerated in November 2007, (Tr. at 462-65), and she did not raise any health concerns on her intake form. (Tr. at 462.) At her initial examination, she appeared alert and cooperative and the staff could not find a single abnormality. (Tr. at 457-60.) Her depression was marked down as a "Past" rather than "Present" issue, and the intake interviewer did not think she was a high risk for assaulting others or damaging property. (Tr. at 455.) She was not referred for further psychological services. (Tr. at 456.)

She was transferred to new facilities multiple times at the start of 2008, (Tr. at 441, 447), but the intake evaluations found no mental health or physical problems. (Tr. at 439-40, 43.) A physician's assistant examined Plaintiff at one of the facilities on July 16, 2008. (Tr. at 436.)

Plaintiff had requested not to be put on a work detail requiring lifting because she had bullet fragment in her left hand. (*Id.*) Her range of motion during the appointment was "good." (*Id.*) In November, Plaintiff's annual health screening report similarly uncovered no abnormalities. (Tr. at 433-34.) A physical examination a few days later produced the same results. (Tr. at 427-31.) One month later she reported that the laxative helped. (Tr. at 426.) She was again transferred in January 2009 and the accompanying examinations again raised no flags. (Tr. at 422-23.) Her first complaint at the new prison was renewed constipation; the treatment notes suggested Plaintiff needed to "increase activity." (Tr. at 416-17.) She also complained of hand pain from her old wound. (Tr. at 415.) However, she requested that the health center clear her to attend "boot camp," which sounds rigorous but is never described. (Tr. at 453.)

In February 2009, she went to the health center with a dull ache in her chest that flared with pain when she coughed or took deep breaths. (Tr. at 413.) Her left hand was painful as well, and her constipation continued. (*Id.*) The examination did not find anything amiss, but the nurse gave her medicine for her stomach and Tylenol for the pain. (Tr. at 414.)

The next record is Plaintiff's psychiatric evaluation conducted for the state agency on May 27, 2009, after her release from prison. (Tr. at 468-70.) She informed the psychiatrist that she had been hospitalized for depression twice when she was a teenager and that she had a history of drug and alcohol abuse. (Tr. at 468.) Her depression had grown worse, she said, now involving crying spells, insomnia, increased appetite, and problems concentrating. (*Id.*) She did not have memory difficulties or paranoid delusions, nor was she suicidal or homicidal. (*Id.*) Her goal was to attain her General Educational Development ("GED") degree. (*Id.*) However, she needed help from her

sister and her boyfriend with daily activities, such as sweeping, which she could not complete because of her constant pain. (Tr. at 469.)

The psychiatrist noted that Plaintiff drove herself to the appointment, yet "seemed unable to take care of her basic needs of food, clothing and shelter on a consistent basis." (Tr. at 469.) Her contact with reality was "limited," she had low self-esteem and "some psychomotor retardation," but she "seemed to be motivated to get better." (*Id.*) Her thinking was monotonous but logical and she was oriented to her surroundings. (*Id.*) The psychiatrist assessed major depressive disorder and assigned a GAF score of thirty, indicating that her "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." Am. Psychiatric Ass'n, *supra*, 34. His prognosis was guarded, he did not believe she could handle her own benefit funds, and he concluded that "she is restricted to work that involves brief superficial interactions with coworkers, supervisors and the public." (Tr. at 470.)

Sheila C. Williams-White, a medical consultant, completed a mental functional capacity report on July 21, 2009. (Tr. at 489-505.) She assessed "Major Depressive Disorder Recurrent with Psychotic Features." (Tr. at 492.) This would cause, however, only mild restrictions in Plaintiff's daily activities, moderate difficulties with social functioning and concentrating, and no extended episodes of decompensation. (Tr. at 499.) Nor would Plaintiff have anything more than moderate limitations in memory and understanding, and only when faced with detailed instructions. (Tr. at 503.) Her concentration and persistence were not significantly limited, except for moderate restrictions in following detailed instructions and concentrating over extended periods. (Tr. at 503-04.) Social settings presented more difficulties, but again she had moderate limits at most and she

13

could adapt to changes in the workplace with moderate difficulty. (Tr. at 504.) Explaining her conclusions, the consultant noted that despite a potentially stressful return from prison, Plaintiff had not sought treatment or medication. (Tr. at 505.) Moreover, her daily struggles related to physical, rather than mental issues. (*Id.*)

Her records over the following months are difficult to decipher. Plaintiff's chest pain continued into July 2009 and in August of that year she developed vaginal bleeding. (Tr. at 511, 515.) Dr. Carl Fowler ordered a radiological examination of her spine in August. (Tr. at 521.) No abnormalities were noted aside from "slight of [sic] L5 S1 intervertebral disc space with small posterior and anterior osteophytes." (*Id.*) However, a computerized tomography ("CT") scan taken on September 8 revealed degenerative changes at "L5/S1," but was "otherwise unremarkable . . . ." (Tr. at 517.) On the same day, Doppler sonography of her pelvis showed cysts on her ovaries. (Tr. at 519.) Her hand pain also persisted through this period. (Tr. at 509.)

Plaintiff returned to New Center on August 31, 2009, for a routine appointment. (Tr. at 700.) She reported the same general conditions, depression and insomnia, and also added that her mood vacillated, sometimes becoming verbally and physically aggressive. (*Id.*) She had not taken medications since 2007. (*Id.*) The counselor diagnosed depression "without psychotic features." (*Id.*)

In May 2010, the police brought Plaintiff to the emergency room at Detroit Medical Center to treat a scratch on her finger after "an altercation." (Tr. at 638.) She refused to cooperate, but the attending physician saw enough to conclude that she did not need stitches and returned her to the police in an "improved" condition. (Tr. at 639.) Her disposition changed the next day when her finger became inflamed, and she returned to the emergency room for treatment. (Tr. at 635-36.)

14

She explained that her sister stabbed her finger, hip, and abdomen during the fight yesterday; the examiner confirmed puncture wounds in these areas. (Tr. at 636.) However, she was "otherwise well" and the doctor provided antibiotics for her inflamed finger. (Tr. at 636-37.)

Plaintiff's neck ached on June 2, 2010, so she headed to the emergency room; the pain turned out to be a sore throat and earache. (Tr. at 633.) But before the staff could investigate, Plaintiff, seeing the waiting room filled with patients ahead of her, decided to leave. (*Id.*) "She was clearly alert," the notes relate, and "in control of [her] faculties, well aware of the consequences of her own actions, able to make decisions as to her own healthcare." (*Id.*)

When she came back to the emergency room on June 7 complaining of the same left neck and ear pain from before, she stayed. (Tr. at 629.) The pain developed a week ago, increased when touched, occasionally spread to her left ear, and seemed related to the "clearish discharge from her right eye . . . ." (Tr. at 630.) She denied other issues, including congestion, headaches, chest pain, shortness of breath, nausea, or "other complaints." (*Id.*) The examiner found that Plaintiff's "left cervical chain area" had lymphadenopathy caused by a "solitary lymph node, . . . swollen and tender to palpitation." (*Id.*) Her neck was supple, and her breathing, clear; no other maladies were apparent and the examiner determined she suffered from lymphadenopathy. (Tr. at 631.) She received a ten-day prescription for an antibiotic and left "in good condition . . . ." (*Id.*)

After seeing Plaintiff in October, Dr. Fowler completed a medical source statement. (Tr. at 507-08, 538-43.) She could lift and carry up to ten pounds continuously, or over two-thirds of the workday; she could never lift or carry anything heavier. (Tr. at 538.) She could sit for three hours, stand for less than one hour, and walk for one hour, otherwise she needed to lie down. (Tr. at 539.) A cane was medically necessary, Dr. Fowler announced, citing a CT scan showing degenerative

15

changes and her complaints of back pain. (*Id.*) Her arm and hand movements were mostly unrestricted, though pushing and pulling were occasional (meaning up to one-third of the day) and her left hand was limited to frequent movements (meaning one-third to two-thirds of the day). (Tr. at 540.) For these propositions, he simply cited, "CT spine." (*Id.*) Her left foot could operate controls up to one-third of the day, while her right foot was unrestricted. (*Id.*) She could never kneel, climb ladders or scaffolds, crouch, or crawl; she could occasionally balance; and she could frequently stoop and climb stairs and ramps. (Tr. at 541.)

Dr. Fowler then marked that he did not evaluate her hearing or vision, but nonetheless proceeded to fill out that portion of the form, finding that her impairments in these areas prevented her from doing nearly anything–such as read a book or a computer screen, tell the difference between small objects like screws and bolts, hear simple instructions, or avoid ordinary hazards in the workplace such as people or vehicles approaching. (Tr. at 541.) She could somehow manage to talk on the telephone, Dr. Fowler conceded. (*Id.*) To concentrate, Plaintiff would need a workplace as quiet as a library. (Tr. at 542.) Finally, he made the following observations: Plaintiff could not go shopping, walk at a reasonable pace, use public transportation, or prepare meals and feed herself; she could travel without assistance, walk without a wheelchair or two canes, "climb a few steps at a reasonable pace," care for her hygiene, and handle paperwork. (Tr. at 543.)

The next visit to the emergency room came in September 2011 as a result of her persistent problem of tingling hands, which she decided to "get . . . checked out." (Tr. at 618.) Her chest hurt too, she claimed, but the examination, including electrocardiograms, did not discover the source; instead she maintained "good strength" in all limbs, could feel light sensations in her arms, and

16

walked normally. (Tr. at 618-19.) The doctor recommended outpatient follow-up, noting that "[s]he has regular insurance and an assigned provider . . . ." (Tr. at 619.)

In February 2011, Plaintiff sought to reopen her case at New Center. (Tr. at 686.) Plaintiff told a counselor during an intake interview that her mother and sister physically abused her during childhood; her child was taken from her at nine months old and her mother now had custody. (*Id.*) She had a hearing in court in a few days, she stated, due to assaulting a police officer. (*Id.*) Her daily activities including "running around," completing errands for her mother, and visiting her sister in a nursing home. (*Id.*) The counselor did not observe psychosis and found Plaintiff's thinking was clear, despite bouts of tears during the session. (*Id.*) Plaintiff's gait was normal. (*Id.*) She used marijuana that day, but had not used cocaine since 2006 and opiates since 2005. (Tr. at 687.) The counselor concluded that Plaintiff ran a high risk of acute intoxication or withdrawal symptoms. (Tr. at 689.) The GAF score was fifty, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *supra* at 34.

On March 17, 2011, Dr. Swarn assessed Plaintiff, finding severe depression with psychotic features and polysubstance dependence. (Tr. at 695-96.) Plaintiff had been without medication since she stopped coming to the clinic roughly one year before. (Tr. at 695.) She denied that she was suicidal, but provided a lengthy list of issues: her depression continued, she struggled to sleep or concentrate, and she heard dead people's voices. (*Id.*) She did not smoke, she asserted, but admitted that just yesterday she drank alcohol and smoked marijuana. (*Id.*) Dr. Swarn observed

that "she was unwilling to provide information" and grew "irritated without any obvious reason." (Tr. at 696.)

She had a medication review at the New Center in April. (Tr. at 693-94.) The interviewer noted that her "gait was slow and guarded." (Tr. at 693.) Plaintiff had no complaints other than feeling tired. (*Id.*) They discussed her drug habit and the counselor decided to continue her medications. (Tr. at 693-94.) During the visit in May, she described a recent arrest for disorderly conduct as evidence of her irritability. (Tr. at 693.) Also, one of her medications had increased her aural hallucinations, so she had stopped taking it; the doctor later agreed to switch medications. (*Id.*) She also decided to stop taking Resperdal "because she said it does not help her." (*Id.*) The counselor, however, continued that prescription. (*Id.*) Slipping back into old habits, she missed her next appointment in June. (Tr. at 692.) In July she called to request that New Center transfer her case to another local center. (*Id.*) Her July medication review found her symptoms growing worse, and the counselor increased her medications and added new ones. (*Id.*)

Pleased with her new therapist at the New Center, she decided to remain there. (Tr. at 593.) In her session on August 15, 2011, she said her mood was "alright" and she was not suicidal, though she continued to hallucinate and appeared sad. (*Id.*) She was agitated though, particularly when discussing the eviction action pending against her; she became emotional and refused to discuss how she paid rent. (*Id.*) Plaintiff calmed down and cooperated with the therapist in filling out disability application paperwork. (*Id.*) The therapist thought Plaintiff was "appreciative of the assistance that she received." (*Id.*) Two days later, Plaintiff called in to complain about the therapist and request a new one. (Tr. at 592.)

She was again agitated during the next session, on August 18. (*Id.*) She told the new therapist that she should have killed herself, but she denied being suicidal and instead pondered killing "'somebody else.'" (*Id.*) Recounting her last appointment, she said she ended the session after losing hope while filling out the disability forms. (*Id.*) She was, however, eating well and taking her medication, and she again denied suicidal or homicidal thoughts. (*Id.*) At the end of the session, the therapist mentioned the incomplete paperwork and brought in a nurse to help her complete it; Plaintiff grew angry and stated, "'I don't want your help. Nobody can do nothing for me, this is a waste of my time.'" (*Id.*) She refused to schedule another meeting. (*Id.*)

The September 12 note from New Center is labeled "Crisis Intervention" and describes Plaintiff's boisterous and surly behavior. (*Id.*) "She stated she still has not received SSD [disability benefits] and verbalized 'you all have not done a thing to help me.'" (*Id.*) She was off of her medication, she said, and demanded to see a doctor, not a therapist. (*Id.*) Calming, she became tearful and expressed suicidal and homicidal thoughts, but denied any plans and signed a "contract" agreeing she would not hurt herself or others. (Tr. at 591-92.) The nurse noted that Plaintiff was concerned about another disorderly conduct "ticket" she recently acquired. (Tr. at 591.) The following week she was more subdued and her appetite suppressed as an eviction and likely homelessness loomed. (*Id.*) The hallucinations persisted. (*Id.*)

She missed her next appointment at New Center because she was in the emergency room that day. (Tr. at 591, 621-28.) It is unclear exactly why she ended up at the emergency room on October 3; the notes mention she was assaulted, (Tr. at 621), but also state the brawl was with "security officers . . . in the emergency department." (Tr. at 624.) In any case, her left arm was twisted behind her back during the a scuffle, she claimed, causing pain in her hand, wrist, and

19

forearm; her "head was turned to the right," causing pain on the left neck that shot down to her chest; and she partially tore off two fingernails. (Tr. at 624-25.)

The notes from this visit state that she was properly oriented and she conversed appropriately with the staff. (Tr. at 625.) Her neck had "some . . . tenderness" but she could move her head left and right beyond forty-five degrees without difficulty. (*Id.*) She could flex and extend the fingers on her right hand. (Tr. at 626.) Her left hand was not tender "in the anatomical snuff box," but was in other places; nonetheless she could "make the okay sign and cross her fingers without difficulty, and . . . ha[d] normal sensation" in all fingers, good finger grip strength, and good range of motion with her left wrist, elbow, and shoulders. (*Id.*) The doctor ran multiple x-rays, covering her left forearm, both hands, left wrist, cervical spine, and lumbar spine. (Tr. at 626-27.) Aside from the lodged bullet fragments, all were "negative," meaning that the doctor saw no abnormalities. (*Id.*) She continued to complain of pain, but upon reexamination she could open and close her fingers against resistance and had good finger grip strength and normal sensation in her fingers. (Tr. at 627.) She was given pain medication, recommendations for hand and sports clinics, and then discharged into police custody. (*Id.*)

A few hours later, still in police custody, she came back complaining that she was not given her inhaler and had begun to feel short of breath. (Tr. at 621.) Her lungs were clear and, when the doctor approached, she was sitting on a bed in no apparent acute distress. (Tr. at 622.) The doctor prescribed an inhaler and returned her to police custody. (*Id.*)

On September 28, 2011, she had a consultative examination with Dr. Cynthia Shelby-Lane, a medical doctor. (Tr. at 572-75.) Plaintiff gave her history and claimed that she had difficulty grabbing and holding objects. (Tr. at 572.) She also asserted that she had arthritic knees, though

20

she lacked any recent verifying x-rays or imaging studies, and "ha[d] not been seen by an orthopedic surgeon." (*Id.*) Further, she considered suicide but never attempted it. (*Id.*) Dr. Shelby-Lane noted that she answered questions "fairly well" and appeared properly oriented. (Tr. at 573.) The physical examination turned up no abnormalities: she walked normally; could slowly climb on and off the table without assistance; could heel, toe, and tandem walk; and her strength and flexibility were normal. (Tr. at 574, 577-80.) She did not need a cane, Dr. Shelby-Lane concluded, and radiological studies of her hand and back revealed in the latter only "minimal narrowing and sclerotic change" at a single disc space, but were otherwise normal. (Tr. at 576.) In conclusion, the doctor felt Plaintiff needed treatment for her medical and mental issues, but did not agree that she had neurological problems or join instability, two of Plaintiff's claims, and instead found that her left hand was normal. (Tr. at 574-75.)

Her next appointment at New Center, on October 6, was uneventful, largely because she wore sunglasses and slurred and mumbled throughout the session. (Tr. at 590.) Two weeks later she called New Center, upset that she had run out of medications before her next appointment. (*Id.*) Plaintiff, piqued that she could not speak with the nurse at that moment, demanded that New Center close her case, and hung up. (*Id.*) A little over an hour after the call, she was able to meet with the nurse and receive new prescriptions. (*Id.*) She noted that the medications decreased her hallucinations. (*Id.*) Four days later she arrived for an appointment, disheveled and mumbling, admitting that she stopped taking her medications and requesting assistance with her disability forms. (*Id.*) Her remaining appointments at New Center through April 2012 continued in the same vein: she was depressed, erratic, agitated, sometimes mumbling and unkempt, other times clear and appropriately attired, sometimes threatening to end her case, but usually returning. (Tr. at 585-89.)

A few notes state that New Center provided her medication samples because she lacked insurance. (Tr. at 585, 586.)

Later in October she returned to the emergency room with eye pain and drainage. (Tr. at 615.) Her vision had not worsened, however, and the doctor could not find any other issues. (Tr. at 615-16.) There was a mild abrasion on her eye and swelling "consistent with some mild blepharitis." (Tr. at 616.) She received antibiotic ointment and Tylenol. (*Id.*)

Two weeks later, increasingly sharp chest pain led her to the emergency room. (Tr. at 612.) She had "some shortness of breath" and congestion, and the pain did not radiate. (*Id.*) She admitted to staff that she had not been taking her pain medications "in the last couple of days." (*Id.*) She was oriented, but mildly distressed, and her lungs were clear, her heart sounded normal, she had full range of motion in all limbs, and her strength was normal. (Tr. at 613.) An electrocardiogram was normal, except a few readings suggested left atrial enlargement, an issue the doctor did not seem to think relevant to her pain. (*Id.*) The x-ray was similarly unexceptional, and the doctor wrote, unhelpfully, her "pain is mostly musculoskeletal secondary to her chronic pain." (Tr. at 614.)

On November 5, 2011, she walked into the Crisis Center at the emergency room feeling depressed. (Tr. at 641.) She inconsistently took her medication, she admitted, and agreed to comply with the prescriptions in the future. (*Id.*) The mental status examination found Plaintiff cooperative, her speech normal, her thoughts were "[g]oal directed," and she denied hallucinations or suicidal thoughts. (Tr. at 641-42.) Her GAF was sixty, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am.

22

Psychiatric Ass'n, *supra* at 34. Plaintiff fell short of the criteria for inpatient services and was discharged. (Tr. at 643.)

Around February 13, 2012, Plaintiff was assaulted, receiving blows on her chest and left neck. (Tr. at 609.) At the emergency room, she said she could turn her head, and added that her left chest, shoulder, and hand hurt. (Tr. at 609-10.) She denied being either homicidal or suicidal. (Tr. at 610.) She moved "all extremities with good power," the doctor observed, and the hand had only "some very mild diffuse tenderness . . . ." (Tr. at 610.) She was discharged with pain medications. (Tr. at 611.)

Three days later, on February 16, the police brought her to the hospital room after she was in a car accident. (Tr. at 603, 607-08.) She had been driving when another car slammed into the front driver's side. (Tr. at 603.) She refused treatment against medical advice during her first visit. (Tr. at 607-08.) The next day, she returned for an examination, complaining that she was "in pain all over." (Tr. at 603.) She had been drinking when the accident occurred, she stated, so the events surrounding it were hazy. (*Id.*) The top of her head was contused, her left eyelid was cut and swollen, her left shin was scraped, and her right knee hurt. (Tr. at 603-04.) Her chest did not hurt, her neck was supple with tenderness in her right trapezius, her lungs were clear, her heart sounded regular, her range of motion was full though she moved her right knee with pain, her gait was normal, and she had full strength in her limbs. (Tr. at 604-05.)

In March, her left breast became tender upon touch. (Tr. at 599-600.) She could not find a lump but was concerned enough to go to the emergency room. (*Id.*) Dr. Robert D. Welch was able to trigger the pain during the examination, and noticed "some possible fibrocystic changes in her breast, but these were not "concerning findings . . . ." (Tr. at 601.) The doctor counseled her to stop

23

using drugs; she had admitted to smoking marijuana that night and consequently the doctor did not think she needed pain medication. (*Id.*) The electrocardiogram and chest x-ray were normal and Dr. Welch recommended that she obtain an ultrasound later; but he discharged her in stable condition.[3] (*Id.*)

### 2.  Third Party Function Report and Hearing Testimony

Plaintiff's friend, Terry Thomas, filled out a function report in April 2009, stating he spent six to eight hours a day with her. (Tr. at 321-28.) He said her primary difficulties were bending, standing for long periods, and using her left hand. (Tr. at 322.) Consequently, she needed help putting on her shoes, getting out of the bathtub, doing her hair, and preparing large meals. (*Id.*) She could, however, prepare food for herself, vacuum, and dust. (Tr. at 322-23.) She could travel alone, but did not drive, and she shopped once or twice per month. (Tr. at 324.) She handled finances adequately, and liked to read and watch television. (Tr. at 324-25.) She had problems lifting over twenty-five pounds, she could walk one-quarter of a mile before resting, she followed instructions "relatively well," and did not use an assistive device, such as a cane. (Tr. at 326-27.)

At her first hearing, on September 17, 2010, Plaintiff was unrepresented. (Tr. at 106-07.) She testified that she saw Drs. Fowler and Austin Alfred in 2009. (Tr. at 111-14.) The latter

---

[3] Plaintiff submitted medical materials produced after the hearing. (Tr. at 704-05.) In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In any case, the report, a psychiatric evaluation, does not add much of use. It states her medications have helped, and that she "has remained clean and sober" for the past year. (Tr. at 704.) The psychiatrist assessed schizophrenia and polysubstance dependence, and assigned a GAF score of forty-six, indicating "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning . . . ." Am. Psychiatric Ass'n, *supra* at 34.

investigated her vaginal bleeding, discovering the cysts on her ovaries. (Tr. at 115.) She then discussed her gunshot wound. (Tr. at 116.) She claimed she had spinal surgery following her rape at age thirteen. (Tr. at 117.) Switching topics, the ALJ, William Callahan, asked about her education; she responded that she needed "two points" to complete her GED. (Tr. at 118.) She did not have a driver's license because she was still paying "responsibility fee[s]" associated with traffic tickets. (Tr. at 119.)

She lived with five others at her parents' house, sleeping upstairs. (Tr. at 121.) On a typical day she saw her daughter off to school, visited her older sister in the nursing home, and helped her mother get to the hospital, sometimes driving her there. (Tr. at 122.) Plaintiff's younger sister prepared meals and her mother worked as a school crossing guard; if her mother did not feel well during work, Plaintiff would sit with her. (Tr. at 122-23.) Plaintiff also helped raise her daughter, shopping with her, teaching her to cook, helping with homework, driving her to school functions, and attending teacher conferences. (Tr. at 123.) However, her daughter was not in school this year after being kicked out last spring. (Tr. at 124.)

Plaintiff last worked at a fast food restaurant before the shooting, when she was still a teenager, but had not worked since because her hand was numb, her chest hurt, and her legs were painful. (Tr. at 124-25.) Dr. Fowler recommended exercising, such as walking, but she never completed the exercise therapy because, she said, she lost Medicaid funding. (Tr. at 127.) She smoked one pack of cigarettes per day and had not used alcohol or drugs for two years, though she was confused on the specific dates. (Tr. at 128.) A VE then testified. (Tr. at 130-38.)

At her second hearing, in front of ALJ VanderHeide on April 24, 2012, Plaintiff was again unrepresented. (Tr. at 68.) She briefly retained a representative "in July," she explained, "but he

had wanted me to do a lot of paperwork and I didn't know how to do it and he wasn't doing it, so I just let him go." (*Id.*)

Plaintiff testified that she took her medications and, when necessary, went to the emergency room, generally for chest pain and numbness in her hands and feet. (Tr. at 75.) Her chest had sharp pains and she suffered breathing problems, she stated. (Tr. at 76.) Her living arrangement had not changed since the last hearing. (Tr. at 79.) Asked "[w]hat's the biggest reason you can't work," Plaintiff replied, "I cannot work because . . . from my knees on down to my legs, they go numb . . . . Like every 30 minutes my toes go numb" on both sides. (Tr. at 80.) Her knees were bad since childhood, she claimed, and she recently broke her hand in a car accident, evidenced by a splint. (Tr. at 80-81.) She carefully parceled out the medications she could afford, using them over longer times than prescribed as a financial expedient. (Tr. at 82.) She did have access to free medicine, despite being off of Medicaid. (Tr. at 83-84.) She candidly confessed to smoking marijuana, "three blunts a day," and drinking on the weekends, but denied using harder drugs. (*Id.*) Her sister provided her the marijuana, so she did not pay for it. (Tr. at 84.)

She explained her failure to receive mental health treatment in prison by noting, "I went and seen that man when I was in prison and he told me he didn't want me to come back. And then when you write a kite [request] to go see them, they don't–you don't get help in there like that." (Tr. at 94.) The next facility she stayed at, for her "whole bit," she claimed, did not offer mental health services. (*Id.*)

Her chest pain, which her bra strap seemed to aggravate, was at a level ten-out-of-ten on a VA scale; "I should be at the emergency, but . . . they [are] not going to do nothing [sic] without the Medicaid." (Tr. at 85.) Sleep and relaxation were the only tools she found for easing her pain.

(*Id.*) Her medicine caused nausea. (Tr. at 86.) Her shower had a chair, due to her mother's condition, and Plaintiff sometimes used it and required help from her daughter. (Tr. at 87.) Her visual hallucinations continued, including visions of "dead people," despite a period of improvement with the medicine. (Tr. at 93.)

She now had a driver's license again, but no car to drive; if she needed to go out, her mother took her or she used public transportation. (Tr. at 88.) She did not shop, clean, or cook, though she could microwave meals. (Tr. at 89.) Her social life was lacking, and she said she spent her days watching music videos. (Tr. at 90.) She could sit in a chair for ten minutes before she "start[ed] slouching and stuff," stand for three minutes, and walk four to five blocks. (Tr. at 92.) Lying down was the best position for her pain. (*Id.*)

The ALJ then asked the VE to

assume a person of the Claimant's age, education, work experience and skill set. Such an individual was limited to sedentary work as defined by the regulations. Such an individual would be limited to occasional pushing or pulling with the left upper extremity. Such an individual would be limited to no climbing ladders, ropes or scaffolds. . . .

[T]his a right-hand dominant individual, with the left hand occasional [sic] overhead reaching and handling. . . . Occasional handling that is gross manipulation other than overhead with the left hand, occasional fingering, fine manipulation of items no smaller than the size of a paperclip with the left hand and occasional feeling with the left hand.

Such an individual should avoid concentrated exposure to environmental irritants such as fumes, odors, dust and gases. Such an individual should avoid all use of moving machinery, all exposure to unprotected heights. Work would be limited to simple, routine and repetitive tasks with only occasional, brief and superficial interaction with the public and only occasional interaction with co-workers.

(Tr. at 97-98.) According to the VE, this individual could work in assembly (2500 positions in southeast Michigan, 5000 in the state), visual inspection (1500 in southeast Michigan, 3000 in the

27

state), and packaging (1800 southeast Michigan, 3600 in the state). (Tr. at 98.) If the individual

could work in light jobs–a specific category of employment–as opposed to sedentary jobs, the VE

testified that the same work would be available in different numbers: 8600 assembly jobs in

southeast Michigan, 17,200 in the state; 3000 visual inspection jobs in southeast Michigan; and

5500 packaging jobs in southeast Michigan, 11,000 in the state. (Tr. at 98-99.) If she was off task

at least twenty percent of the workday, the individual would be unemployable. (Tr. at 99.)

## F.     Analysis and Conclusions

### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual

functional capacity ("RFC") to perform a limited range of sedentary work:

> [T]he claimant has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 416.967(a) except the claimant could occasionally push or pull
> with the left upper extremity. The claimant could never climb ladders, ropes, or
> scaffolds. She could have occasional left upper extremity overhead reaching and
> handling; occasional handling, that is gross manipulation; occasional fingering, that
> is fine manipulation of items no smaller than the [size] of a paper clip, and
> occasional feeling with the left hand. The claimant should avoid all use of moving
> machinery and all exposure to unprotected heights. The claimant should avoid
> concentrated exposure to environmental irritants such as fumes, odors, dusts, and
> gases. The claimant's work is limited to simple, routine, and repetitive tasks. The
> claimant could have only brief and superficial interaction with the public and
> occasional interaction with co-workers.

(Tr. at 53.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties. Jobs are sedentary if walking and standing
> are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(b), 416.967(b).

28

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.      Substantial Evidence

Plaintiff finds two problems in the ALJ's decision. First, she claims the ALJ put undue emphasis in the credibility determination on her lack of consistent treatment. (Doc. 18 at 11-13.) When mental health issues are involved, she asserts, a record noncompliance and inconsistent treatment have limited probative value. (*Id.* at 12-13.) And in any case, she explains why she missed appointments and sporadically adhered to her medications. (*Id.*) Her final argument faults the ALJ for not giving the opinions of Dr. Fowler, whom she characterizes as a treating physician, controlling weight or providing "good reasons" for doing otherwise. (*Id.* at 13-17.) Plaintiff claims in essence that substantial evidence did not exist elsewhere in the opinion to construct an RFC without Dr. Fowler's functional report, the only such opinion in the record. (*Id.* at 16.)

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld. I suggest that is the case here, and recommend upholding the ALJ's findings.

### a.      Medical Sources and Plaintiff's Credibility

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations

carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a multi-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and

30

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No.

09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377,

379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ

evaluates complaints of disabling pain by confirming that objective medical evidence of the

underlying condition exists. The ALJ then determines whether that condition could reasonably be

expected to produce the alleged pain or whether other objective evidence verifies the severity of

the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health*

*& Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y*

*of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of

the work-related limitations by determining the intensity, persistence, and limiting effects of the

claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853

(quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his

physical or mental impairments alone is "not enough to establish the existence of a physical or

mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the

claimant's subjective complaints about the severity and persistence of the pain simply because they

lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence

of objective confirming evidence forces the ALJ to consider the following factors:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)     Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)     Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

33

### b.      Analysis

#### i.      Credibility

Plaintiff first criticizes the ALJ's use of Plaintiff's spotty record of complying with doctors' recommendations and following through with treatments. (Doc. 18 at 11-13.) The consistency of treatment is one of the factors the ALJ can consider in the credibility analysis. 20 C.F.R. § 416.929(c)(3). An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical record reports or records show that the individual is not following the treatments as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186, at *7. Adequate reasons for choppy compliance include, among others, severe side effects from the medications and inability to afford the treatment. *Id.* at *8. The ALJ must consider those reasons before drawing conclusions from the inconsistent treatment or noncompliance. *Id.*

The ALJ mentioned this factor multiple times, noting that Plaintiff did not receive significant treatment in prison, (Tr. at 54), did not adhere to the New Center program, (Tr. at 55), stopped seeing Dr. Fowler in October 2010, (*Id.*), and frequently missed her medications, (Tr. at 57). The ALJ also observed that Plaintiff's emergency room visits were often caused by "altercations, assault, or motor vehicle accidents," and when "other acute symptoms" led her there, she was frequently on drugs or alcohol. (Tr. at 55.) Plaintiff offers reasons in response: Plaintiff could no longer afford to see Dr. Fowler after losing her Medicaid and health insurance, (Doc. 18 at 12), she relied on free sample medications due to the same financial constraints, (*Id.*), many visits to the hospital were prompted by her chronic pain, (*Id.* at 12 n.4), and she was incarcerated around the time she started missing appointments at New Center. (*Id.* at 5.)

34

Plaintiff's responses are, in turn, undercut by various pieces of evidence arrayed in Defendant's brief and contained elsewhere in the record. (Doc. 20 at 6-11.) First, the date when her insurance ran out is unclear. She claims she lost it by October 2010, when she last saw Dr. Fowler. (Tr. at 114.) But emergency room notes from September 2011 state, "She has regular insurance . . . ." (Tr. at 619.) Perhaps an offhand remark from hastily drafted emergency room documents is not the soundest proof of insurance, but it at least muddies the waters and gives cause to question Plaintiff's testimony.

Additionally, the sessions at New Center were free, and the medications were often dispensed as free samples. (Tr. at 75, 84, 585, 586.) Plaintiff did testify that she took the medications over longer periods to make them last, (Tr. at 82), but elsewhere in the record her actions appear less calculated, as in her New Center intake report in 2009 stating she had taken no medications since 2007, (Tr. at 700), or in the similar 2011 form that mentioned her failure to use medication over the prior year. (Tr. at 695.) She also informed the emergency room Crisis Center that she took her medication, but was "not very regular with it." (Tr. at 641.) Other times, she consciously chose to discontinue her medications, such as when she decided in April 2011 that one particular drug "does not help her," but the doctor, hearing this, extended her prescription anyway. (Tr. at 693.)

On other occasions, her compliance vacillated in ways that suggest that something other than prudent frugality was behind it. On August 15, 2011, Plaintiff reported to the New Center that she consistently had been using her medications; she received new prescriptions at the end of the session. (Tr. at 593.) One month later she entered the Center in an erratic mood, boisterous and agitated, and said "she has been without medication and needed to be seen by a doctor 'right

35

now.'" (Tr. at 592.) It is evident from the episode that she could comply at times, as she had before August 15, and she again confirmed during a visit three days later. (*Id.*) It also indicates that she believed she could obtain the necessary medications by seeing the therapists.

She apparently did not tell them of her financial need to vary the medication schedule. On October 6, 2011, for example, a therapist denied her request for medication because the progress notes showed Plaintiff "had enough meds until she comes back." (Tr. at 591.) Her lack of pills here does not demonstrate that she carefully parceled them out, and though she had missed her prior medication review, the therapist thought the shortage was inexplicable. (Tr. at 590-91.) Plaintiff's noncompliance, then, resulted from at least a modicum of carelessness, rather than simply her impecunious circumstances and accompanying diligent efforts to stretch out her prescriptions.

Plaintiff is careful not to look too closely at the dates in 2006 and 2007 when she started missing New Center appointments, instead claiming she was "incarcerated at about this time." (Doc. 18 at 5.) Yet, Plaintiff entered prison in November 2007, (Tr. at 462-65), but she began skipping sessions in October 2006 and missed many over the next year. (Tr. at 401-04.) By January 2008, when her case was closed, Plaintiff had not been to the Center in over one year. (Tr. at 401.)

This evidence supports the ALJ's use of noncompliance and inconsistent treatment in the credibility analysis. Plaintiff's explanations fail to neatly cancel out the substantial record of her noncompliance. And to the extent the evidence could be used at all, it cast doubt on Plaintiff's credibility. However, a body of case law cautions ALJs against reading too much into this factor. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very

36

failure to seek treatment is symply another symptom of the disorder itself."); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment . . . nor did she note [his] . . . inability to pay . . . .").[4]

Here, the record of her noncompliance is ample, covering years of missed appointments, medications, and quickly dropped medical requests. On June 2, 2010, for example, she left the emergency room before seeing a doctor because, it seems, the wait was too long. (Tr. at 633.) She did not return for five days. (Tr. at 629.) She went years between visits at New Center. (Tr. at 401, 695.) Perhaps the persistency of noncompliance attests to the depth of her mental problems, but it is also possible that it demonstrates her problems were less severe than claimed. *See, e.g.*, *McClain v. Comm'r of Soc. Sec.*, No. 10-11141, 2011 WL 4599611, at \*2 (E.D. Mich. Sept. 30, 2011) ("While the question is a close one, the Court agrees . . . that the ALJ properly looked to the materials in the administrative record, rather than engaging in impermissible speculation, in concluding that Plaintiff's failure to follow through with recommended mental health treatments provided a basis for discounting her credibility."). Where treatment gaps are unexplained or largely

---

[4] Indeed, studies consistently show that depressed individuals are less likely to adhere to prescriptions than others, though the research includes the normal hedge that the results show correlation rather than causation. That is, the studies do not show depression causes the noncompliance. *See* Jerry L. Grenard, et al., *Depression and Medication Adherence in the Treatment of Chronic Diseases in the United States*, 26 J. Gen. Internal Med. 1175, 1178 (2011) ("The estimated odds of a depressed patient being non-adherent are 1.76 times that of the odds of a non-depressed patient . . . ."); Lars Osterber & Terrence Blaschke, *Adherence to Medication*, 353 New Eng. J. Med. 487, 493 (2005) ("Patients with psychiatric illness typically have great difficulty following a medication regimen . . . ."); Kathryn K. Bucci, et al., *Strategies to Improve Medication Adherence in Patients With Depression*, 60 Am. J. Health-System Pharmacy 2601, 2601 (2003) (noting studies showing higher noncompliance rates among depressed populations); S. Pampallona, et al., *Patient Adherence in the Treatment of Depression*, 180 Brit. J. of Psychiatry 104, 106 (2002) ("[A]dherence is a major problem in the treatment of depression. . . . [E]vidence from descriptive epidemiological studies confirmed that about one in three patients could not complete treatment."); M. Robin DiMatteo, et al., *Depression is a Risk Factor for Noncompliance With Medical Treatment*, 160 Archives Internal Med. 2101, 2105 (2000) ("[D]epressed patients were 3 times as likely as nondepressed patients to be noncompliant.").

unjustified, an ALJ can accept them as indications that the claimant is overselling the severity of the symptoms. *See White*, 572 F.3d at 283-84. The ALJ reasonably drew this conclusion, and her decision has substantial support.

In any case, courts reviewing credibility determinations operate in narrow confines: "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions" concerning credibility, the decision will not be reversed. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012.) The Sixth Circuit has accordingly upheld credibility findings where the decision placed too much importance on failing to follow recommended treatment but was supported by substantial evidence nonetheless. *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013). As noted, it is not clear that the ALJ even erred here. At worst, she overemphasized a single factor. Even so, substantial evidence surrounding other credibility factors supports her decision.

The ALJ properly questioned Plaintiff's testimony on her daily activities, where she said she did not cook or clean, based on Terry Thomas's report, which reported she cooked, did light housekeeping, and shopped. (Tr. at 52, 89, 322-24.) Moreover, her testimony clashes with her statements to a therapist in 2011 that she spent her days "running around" and finishing her mother's errands. (Tr. at 686.; *see also id.* at 122.) Also, two of her GAF scores indicated only moderate difficulties in social functioning.[5] (Tr. at 407, 643.) The ALJ further acknowledged Plaintiff's moderate difficulties in social functioning, again noting Mr. Thomas's report of placid relations between Plaintiff and others and Dr. Shelby-Lane's observation that Plaintiff was

---

[5] The ALJ mischaracterizes the GAF scores as "high" when two of the four indicate serious symptoms or worse. (Tr. at 52, 469, 643, 689.) Yet the scores, displaying social functioning, are only tangentially related to her daily activities.

cooperative. (Tr. at 52, 326, 573.) Her temper was undeniable, however, as evidenced by her altercations, (Tr. at 637, 638, 686); nonetheless, the ALJ could find that the total picture showed only moderate issues. The ALJ also observed, accurately, that Plaintiff's treatment was conservative, generally consisting of medications. (Tr. at 54.) Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

More important to the ALJ's assessment is the objective medical evidence, which repeatedly failed to uncover significant physical limitations; and while the objective mental health evidence is more mixed, it too supports the decision. The ALJ discusses the objective reports in Plaintiff's favor: Dr. Fowler found weakness and positive straight leg raising tests in her left leg, and an x-ray showed degenerative changes at disc space L5-S1. (Tr. at 54, 517, 521.) Yet, these are among the sole objective reports bolstering Plaintiff's case. As the ALJ notes, most "musculoskeletal and neurological exams returned within normal limits," as did other results. (Tr. at 54.) This accurately summarizes reams of tests on her physical and mental states, including both observational and diagnostic reports. (Tr. at 414, 427-31, 433-34, 436, 439-40, 443, 574-80, 601, 609-10, 613-14, 615-16, 618-19, 626-27, 631 .) Notably, her gait was normal, if sometimes slow, (Tr. at 604-05, 609-10, 618-19), as was her strength, (Tr. at 604-05, 613, 618-19), including her grip which was tested in depth and found normal, (Tr. at 574, 577-80, 626-27). Plaintiff was even encouraged by the prison health staff to "increase activity." (Tr. at 416-17.) Also, as the ALJ wrote, Plaintiff was frequently high on marijuana when describing her illnesses, perhaps skewing her subjective descriptions.[6] (Tr. at 54-55.)

_____

[6] Plaintiff frequently discussed her use of marijuana, describing it as regular–"three blunts a day," she told the ALJ, (Tr. at 83)–and confessing on a few occasions that she took it before arriving at the hospital. (Tr. at 600, 604,

Plaintiff's testimony also raises doubts. She testified that she could sit for ten minutes at a time, (Tr. at 92), before slouching, but the ALJ observed she "was able to participate in the near one hour hearing without appearing in discomfort." (Tr. at 58.) Plaintiff stated at the hearing, for perhaps the first time, that her legs went numb frequently, and that this was the biggest impediment to her working. (Tr. at 80.) The records include hardly any such complaints. Other testimony was vague, such as her reasons for not obtaining mental health treatment in prison: a man told her not to "come back" and the facility did not have a mental health clinic. (Tr. at 94.) Michigan Department of Corrections's mental health program, however, appears to be available to the entire prison population. *See* Michigan Dep't of Corrections, *Mental Health*, http://www.michigan.gov/corrections/0,4551,7-119-68854_68856_9744---,00.html (last visited Oct. 15, 2014). Her testimony thus adds further to support to the ALJ's decision.

I suggest that the ALJ's credibility analysis, even if found to err on the noncompliance factor, is supported by substantial evidence and should be upheld.

### ii. *Dr. Fowler's Opinion*

Plaintiff also claims that the ALJ failed either to accord Dr. Fowler's opinion the controlling weight due a treating source, or provide good reasons for not doing so. (Doc. 18 at 13-17.) Plaintiff is mistaken. First, she assumes without analysis that Dr. Fowler is a treating source, and Defendant adopts this assumption. (Doc. 20 at 12.) But this is not a foregone conclusion. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified

---

610, 613, 616, 630, 636.) One of her persistent symptoms was hallucinations. (Tr. at 93, 406, 590-91, 593, 693.) Marijuana, or cannabis, is categorized as a hallucinogen in the criminal code, 28 U.S.C. § 812, and is described as such in the medical literature. Am. Psychiatric Ass'n, *supra* at 237 (noting that symptoms of cannabis intoxication include "distorted sensory perception"). *See also* Abbie Crites-Leoni, Comment, *Medicinal Use of Marijuana*, 19 J. Legal Med. 273, 280 (1998) (noting that marijuana "may cause . . . delusions, depersonalization, hallucinations, paranoia, depression, and uncontrollable hostility").

40

psychologists." 20 C.F.R. §§ 404.1513(a)(1)-(2), 416.913(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. §§ 404.1502, 416.902. That is, treatments or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source."). Finally, a physician the claimant consults only to obtain a report for her disability claim is not a treating source. 20 C.F.R. §§ 404.1502, 416.902.

Dr. Fowler's status as a treating source is questionable. The treatment period was slim. Plaintiff states that she saw him "on several occasions between June 2009 and October 2010," (Doc. 18 at 16), but it would be more accurate to say that she saw him five times from June 2009

to November 2009, and once again in October 2010, just before he drafted his opinion. (Tr. at 507-16.) The session notes are nearly illegible, but the portions of the forms for tests and diagnostic services were always blank–though he ordered three radiology tests in 2009, (Tr. at 521)–and only three or four appointments appear to have included a physical examination, the notes from all examinations consisting simply of vertical lines checking either that he reviewed the area or that Plaintiff was within normal limits in that area. (Tr. at 508, 512, 514, 516.) They provide little, if any substantive content. Finally, he did not focus on a particular problem but instead treated all her symptoms. This erodes confidence that his specialization made his brief treatment period particularly profitable and his opinion useful.

Nonetheless, as the parties do not dispute the relationship, I will assume he is a treating source. The next step then is reviewing the ALJ's analysis of his functional report. An opinion from a treating source controls the ALJ's findings unless either (1) it is not "well-supported" by objective medical evidence, or (2) it is inconsistent with substantial evidence. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*. 710 F.3d 365, 376-77 (6th Cir. 2013). The ALJ must provide "'good reasons'" for why the opinion "fail[s] to meet either prong of this test." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). Once the ALJ proffers sufficient reasons, she must analyze the opinion under the seven specific factors listed in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *Gayheart*, 710 F.3d at 376. As noted above, the test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544.

42

The ALJ correctly showed that the opinion here is not well-supported and substantial evidence is lined against it. The ALJ started by citing the only diagnostic tests Dr. Fowler ran, an x-ray and CT scan, each of noted degenerative changes at one disc space in her back. (Tr. at 54.) Yet, more recent scans, such as the one taken in September 2011 and reviewed by Dr. Shelby-Lane, showed that disc space had only "minimal narrowing and sclerotic change." (Tr. at 576.) The ALJ also questioned the source of Dr. Fowler's opinion that Plaintiff needed a cane, a conclusion that is apparent nowhere else in the record and was belied by her normal gait at the hearing, which the ALJ observed. (Tr. at 55-56, 58.) Moreover, Plaintiff testified that Dr. Fowler recommended exercises such as walking to help her condition, which does not necessarily contradict the need for a cane, but perhaps undermines it. (Tr. at 127.) The ALJ also mentioned Dr. Fowler's conservative treatment, which diminishes the persuasiveness of the drastic limitations he prescribed. (*Id.*) Finally, the ALJ discussed other opinions from consultative examinations and the objective evidence described above (Tr. at 54-58); all of which justifies not according the opinion controlling weight.

The ALJ then used the regulatory factors in 20 C.F.R. § 416.927(c)(2) to critique the opinion. (Tr. at 55-56.) When Dr. Fowler filled out his report, he had seen her once in the past year, and that had occurred just prior to his report, suggesting she was seen for that purpose only. (Tr. at 56, 507-08.) Further, the ALJ properly observed that the treatment relationship was limited and that Dr. Fowler did not see Plaintiff after writing the opinion. (Tr. at 56.) Plaintiff protests the latter comment, (Doc. 18 at 16), but it accurately depicts the fact that he did not see her for most of the claimed disability period. The ALJ stated that the RFC nonetheless incorporated Dr. Fowler's plausible conclusions by limiting her to a restricted range of sedentary jobs. (Tr. at 56.)

This does not appear to be a throwaway line: Dr. Fowler is nearly the only source, or even piece of evidence, in the record supporting her walking restrictions. Most other evidence showed her gait and strength were normal. (Tr. at 604-05, 609-10, 613, 618-19.)

Dr. Fowler's opinion suffers additional internal ambiguities and inconsistencies. A few of its conclusions seem to paint Plaintiff's health as relatively robust: she could lift ten pounds for up to two-thirds of the workday, her hand and arm movements were not significantly restricted, she could frequently (i.e., one-third to two-thirds of the day) stoop and climb stairs and ramps. (Tr. at 538-40.) The only substantial constraint he crafted, one that would preclude work, is her walking, standing, and sitting needs: she could do all combined for less than five hours per day. (Tr. at 539.) He ended with a bizarre set of conclusions: she could not shop, cook, walk at a reasonable pace, or use public transportation; but she can travel without assistance and "climb a few steps at a reasonable pace." (Tr. at 543.) This misshapen lump of statements not only seems to include internal contradictions or tensions–she can mount stairs while traveling alone, but not sit on a bus?–but also is contradicted by the record, which shows she could cook, drive, use public transportation, and walk without assistance. (Tr. at 88, 123, 363, 604-05, 609-10, 618-19.) Finally, his marks on the hearing and vision portion seem misplaced, as he said he did not test these areas. (Tr. at 541.)

Thus, contrary to Plaintiff's assertion, the record did not need to contain dueling medical source opinions for the ALJ to reject Dr. Fowler's. (Doc. 18 at 14-16.) Substantial evidence supports the ALJ's decision and I recommend affirming it.

44

### 3.      Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response

45

proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d). The response must specifically address each issue raised in the objections, in the same

order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the

Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2014            /S PATRICIA T. MORRIS
                                   Patricia T. Morris
                                   United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 31, 2014            By     s/Jean L. Broucek
                                   Case Manager to Magistrate Judge Morris